AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Ahmad Waley Khan | ) | Case No. |
| | ) | |
| | ) | 2:25-mj-0172 JDP |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

**FILED**
Nov 14, 2025
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___10/13/2025 - 11/7/2025___ in the county of ___Sacramento___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |
| 18 U.S.C. § 922(a)(1)(A) | Unlawful Dealing in Firearms |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF FBI Special Agent Matthew J. Weissenborn

☑ Continued on the attached sheet.

/s/ Matthew J. Weissenborn
*Complainant's signature*

Matthew J. Weissenborn, FBI Special Agent
*Printed name and title*

Sworn to and signed before me telephonically.

Date: November 14, 2025

*Judge's signature*

City and state:     Sacramento, California        United States Magistrate Judge Jeremy D. Peterson
*Printed name and title*

## AFFIDAVIT OF FBI SPECIAL AGENT MATTHEW J. WEISSENBORN

I, Matthew J. Weissenborn, being duly sworn, hereby depose and state:

## PURPOSE

1.    This Affidavit is made in support of search warrants for the following locations, persons, and property, more fully described in Attachments A-1 through A-13.

    a.  The residence of Terry Chafin ("Chafin"), as further described in A-1;

    b.  The residence of Ahmad Waley Khan ("Khan"), as further described in A-2;

    c.  The residence associated with Khan further described in A-3;

    d.  The storage unit of Chafin, as further described in A-4;

    e.  The storage unit associated with Khan, as further described in A-5;

    f.  The cellular telephone of Chafin as further described in A-6;

    g.  The cellular telephone of Khan as further described in A-7;

    h.  The motor vehicle used by Chafin as further described in A-8;

    i.  The motor vehicle used by Chafin as further described in A-9;

    j.  The motor vehicle used by Khan as further described in A-10;

    k.  The motor vehicle used by Khan as further described in A-11;

    l.  The person of Terry Chafin as further described in A-12; and

    m. The person of Ahmad Khan as further described in A-13.

2.    This Affidavit is further made in support of arrest warrants for Terry Chafin and Ahmad Waley Khan.

3.    I assert that there is probable cause to believe that the locations/persons described above are instrumentalities, contain contraband, and/or contain evidence of criminal violations of 18 U.S.C. §§ 922(g)(1) & (a)(1)(A) (felon in possession of a firearm / ammunition and unlawfully engaging in the business of dealing in firearms) as detailed in Attachment B.

4.    I further assert that there is probable cause to believe that Terry Chafin and Ahmad Waley Khan have engaged in violations of 18 U.S.C. §§ 922(g)(1) & (a)(1)(A) (felon in possession of a firearm / ammunition and unlawfully engaging in the business of dealing in firearms).

## BRIEF CASE OVERVIEW

5.    This is a firearms possession and dealing case in which an undercover law enforcement officer has purchased six rifles (two of which have been represented to be fully automatic and one of which was reported stolen from a gun shop in October of 2025) and ammunition at a cost of over $14,500 from convicted felon Terry Chafin over the course of four separate purchases.  The purchases occurred in October and November of 2025.  Investigation indicates that convicted felon Ahmad Waley Khan has assisted and received money for part of the dealing at issue in this matter.  Three residences, four vehicles, two storage units and two phone numbers have been identified as associated with these undercover firearms purchases.

## AGENT BACKGROUND

6.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the Sacramento Field Office and have been so employed for over a decade. I received training at the FBI Academy in Quantico, Virginia from October 2012 to March 2013.  During my tenure with the FBI, I have worked in the areas of white-collar crime, counterterrorism, counterintelligence, cyber and violent crime.  I have served as a Supervisory Special Agent at FBI Headquarters in Washington, D.C., and presently serve as a firearms instructor, in addition to working violent crime.  Before joining the FBI, I practiced law for approximately five years.

7.    I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the

United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

8. I have conducted multiple investigations pertaining to violations of 18 U.S.C. § 922(g), authored and executed multiple warrants pertaining to violations of 18 U.S.C. § 922(g), and encountered multiple firearms and "ghost guns" in connection with those investigations.  I have consistently trained with, and used operationally, both handguns and carbines in my work as an FBI Special Agent, and have handled a variety of firearms in training, field work and personally.

9. This affidavit is based upon my own personal knowledge but also the knowledge and/or reports of other law enforcement officers and/or third parties (for example, law enforcement officers with the West Sacramento Police Department).  Where I describe statements made by other people (including other law enforcement officers), information contained in reports and/or other documents or records in this affidavit, that information is described in sum, substance, and relevant part. Where I insert images below, they are images pertaining to the incident or evidence being described.

10. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**STATEMENT OF PROBABLE CAUSE**

*Terry Chafin has previously been convicted of a felony offense and is therefore prohibited from possessing firearms and ammunition.*

11. On or about September 28, 1999, Terry Chafin was convicted of violating California Penal Code 496(a) (receiving known stolen property), a felony. On or about October 2, 2003, Chafin was convicted of violating California Penal Code 487(A) (grand theft), also a felony.  On or about August 24, 2012, Chafin was convicted of violating California Penal Code 422 (threaten crime with intent to terrorize), also a felony.  On or about July 12, 2019, Chafin was convicted of violating California Penal Code 4573.6 (possession of a controlled substance in prison), a felony.

***Ahmad Waley Khan has previously been convicted of a felony offense and is therefore prohibited from possessing firearms and ammunition.***

12. On or about April 7, 2014, Ahmad Khan was convicted of violating California Penal Code 211 (First Degree Robbery), a felony. He was sentenced six years in prison.

***Lead for Firearm Purchase***

13. In October of 2025, an FBI Confidential Human Source ("CHS-1"), provided information to the West Sacramento Police Department that Chafin was involved in illegal gun sales. CHS-1 gave a West Sacramento Police Department undercover officer, UC-1, the following contact number for Chafin: 530-315-5588 (A-6).

14. UC-1 was already familiar with who Chafin was from a previous investigation.

***Undercover Purchase #1 (October 13, 2025; Woodland, CA)***

15. On October 13th, 2025, UC-1 contacted Chafin at the number provided by CHS-1. UC-1 told Chafin UC-1 wanted to buy two AR-style rifles. Chafin said it would cost $1,500 per rifle. UC-1 said UC-1 would meet later that evening.

16. At approximately 7:04 p.m., Chafin texted UC-1: "35 matmor drive it's storage star."

    a. I obtained the rent roll for the Storage Star located at 35 Matmor Drive, Woodland, CA, through the use of legal process. Terry Chafin is listed as the tenant for unit 152 (A-4). It is described as a "10X20NON". Chafin's address is listed as 7479 Henrietta Drive, Sacramento, CA. I note that this address is associated with Chafin in Accurint, an open-source database. Chafin's cell phone is listed as 916-380-1564 and email as terrychafin78@gmail.com. I note that this cell phone number and email address are also associated with Chafin in Accurint, despite the fact that Chafin was in fact born in 1979.

17. At approximately 7:30 p.m., investigators held a preoperational briefing in Woodland, California. By approximately 8:00 p.m., they had established surveillance in the area of the Storage Star designated by Chafin.

18. UC-1 traveled in an undercover vehicle to the Storage Star and parked in a lot just north of the address. UC-1 contacted Chafin via cellphone. Chafin said he was about five minutes away in a white Chrysler.

19. At approximately 8:40 p.m., a white Chrysler 300 arrived at the Storage Star and entered the secured storage area parking lot. About five minutes later, the vehicle left the lot and parked in a lot directly south of Storage Star. UC-1 parked directly behind the white Chrysler, which had a California license plate 9KAM053 (A-8). Chafin exited from the front passenger seat, opened the trunk, and pulled out two rifles wrapped in a blanket, with the barrels sticking out of the top.

   a. California License Plate 9KAM053 is registered to Polly Ann Baxter Lam at 729 West Cross Street, Woodland, CA (A-1), which, as described below, investigators have reason to believe is Chafin's actual residence.

   b. Per Yolo County Probation, on August 22, 2025, during an unrelated home compliance search at 729 Cross Street (which I believe to in fact be 729 West Cross Street because based on my research it does not appear that there exists a 729 Cross Street in Woodland, CA), involving Kashmir Lam, Chafin reported he was Lam's boyfriend and had been residing at the home for approximately one month. It was determined that Chafin had three outstanding felony warrants and he was arrested. Chafin requested that his wallet, phone and keys be given to Kashmir, which they were.

   c. After another firearm purchase involving Chafin on October 30, 2025, Chafin was observed arriving in the white Chrysler at 729 West Cross Street, Woodland, CA and entering the residence through the front door. Further, a black BMW that Chafin drove to a prior firearm purchase on October 17, 2025, was parked outside the home and Chafin was seen working on the vehicle.

20. Chafin entered the front passenger seat of UC-1's vehicle. Chafin handed UC-1 the first rifle, a 5.56 AR-style privately manufactured rifle bearing serial number V5FMBUS1U with an optic mounted on top. UC-1 checked

to make sure the rifle was unloaded and safe, then switched the safety to off and pulled the trigger. This was to perform a function check and confirm the rifle was working properly. The rifle performed as a fully functional rifle would in such a function check.

21. Chafin then handed UC-1 the second rifle, an Adler Jager AP 74 .22 caliber AR style rifle bearing serial number 114952. UC-1 removed the magazine and attempted to slide the bolt to the rear, but it was stuck. Chafin assured UC-1 that the rifle was in functioning order.

22. While UC-1 was inspecting the rifle, Chafin told UC-1 that he had more firearms to sell, including a .308 rifle. UC-1 told Chafin UC-1 would need more firearms soon, and Chafin agreed. Before exiting the vehicle, Chafin took a handful of .22 caliber ammunition and placed it in UC-1's cupholder. After Chafin returned to the front passenger seat of the white Chrysler, UC-1 left the scene.

23. While booking the second rifle, UC-1 was able to pull the bolt to the rear and perform a function check and the rifle operated properly and appeared to be in working order.

*Undercover Purchase #2 (October 17, 2025; Sacramento, CA)*

24. On October 16, 2025, Chafin messaged UC-1 and said he had a couple of "AKs" with drums. "Drums," or drum magazines, can hold a high capacity of ammunition. UC-1 said UC-1 was interested. UC-1 and Chafin could not agree on the price. Chafin then sent several pictures including AR-style rifles, an upper and magazines, some of which are depicted below:




 

25. Chafin and UC-1 agreed on a price for two rifles, that being $2,500 for the red AR-style short-barreled rifle and $3,500 for the black AR-style rifle that included a 5.56 upper receiver and a .50 Beowulf upper receiver. Chafin stated that both rifles would come with ammunition.

26. Chafin also indicated that his supplier, the "Pakistani," would be involved in the transaction.

27. UC-1 planned to meet with Chafin and the "Pakistani" at approximately 1:00 p.m. on October 17, 2025. Chafin told UC-1 they would meet at a Chevron near El Camino Avenue. At approximately 12:37 p.m., Chafin texted UC-1 to meet at 1832 El Camino Avenue, Sacramento.

28. At approximately 1:13 p.m., Chafin said the deal would need to be delayed until 3:00 p.m. because the "Pakistani" needed to go to prayer with his father.

29.   At approximately 3:00 p.m., UC-1 arrived at the Chevron gas station and parked in the lot. Approximately five minutes later, a white Ford sedan parked one space away from UC-1's vehicle. UC-1 observed a male driver wearing sunglasses, estimated to be 30 to 40 years old. In the passenger seat was another male, estimated to be 60 to 70 years old, with a long beard. At that point, it was unknown whether the white Ford sedan was involved. After roughly 10 minutes, the vehicle drove away.

30.   At approximately 3:24 p.m., UC-1 received a call from Chafin, who said he was at the location. Chafin mentioned he was parked at the gas pumps. UC-1 drove from UC-1's parking spot to the gas pumps and pulled up nose-to-nose with a black BMW with California license plate 9AJS091 (A-9). Chafin was standing near the vehicle. At that moment, the same white Ford sedan pulled up directly next to the black BMW.

   a.   California license plate 9AJSO91 is for a 2013 BMW registered to Terry Chafin at 729 W Cross St, Woodland, CA 95695.

31.   Chafin opened the trunk of the white Ford sedan and pulled out a suitcase. He carried the suitcase over to UC-1's vehicle. UC-1 could see the same occupants inside the white Ford sedan as before.



32.   Chafin placed the suitcase in the rear seat of UC-1's vehicle and opened it while standing just outside the open rear door. Inside was a red 5.56

Spike's Tactical AR style ST15 rifle with a loaded drum magazine bearing serial number 088308. UC-1 picked up the rifle, checked to ensure it was unloaded, and then performed a function check. The rifle appeared to be in good working order. UC-1 handed Chafin $2,500. Chafin took the money and handed it to the younger male sitting in the front seat of the white Ford sedan.

33. Chafin then returned to the front passenger seat of UC-1's vehicle. He told UC-1 that the subject would pick up the other firearm from the storage facility. At this point, investigators surveilled the white Ford sedan with California license plate 8NNK257 (A-10), heading to Public Storage at 1820 Frienza Ave, Sacramento, CA, just north of the Chevron gas station.

34. An aerial surveillance asset observed the subject drive to a building on the east side of the Public Storage complex and enter a door. The subject reappeared shortly afterward and drove back to the Chevron gas station.

   a. On November 13, 2025, I obtained a rent roll for the Public Storage located at 1820 Frienza Ave, Sacramento, CA. The only "Khan" associated with any unit on the roll is Sowila Khan, for unit D069, and a paid through date of November 30, 2025. Accurint lists Sowila Khan as a first degree relative of Ahmad Khan. Based on these facts, there is probable cause to believe that Khan used storage unit D069 in connection with the undercover firearm sale on October 17, 2025.

35. UC-1 observed Chafin retrieve a dark-colored duffle bag from the vehicle and place it into the rear passenger seat of UC-1's vehicle. UC-1 opened the bag, which contained an American Tactical Omni Hybrid AR bearing serial number NS012041 assembled with a 5.56 upper, magazines, a .50 Beowulf upper, and .50 Beowulf ammunition. UC-1 function-checked the rifle, and it appeared to be in working order.

   a. Based on the headstamp and my own research, I suspected that this ammunition was manufactured by Alexander Arms. On November 11, 2025, I communicated with a Production Planner at Alexander Arms who confirmed that the headstamps were Alexander Arms' and that the .50 Beowulf bullets are manufactured in Radford, Virginia. Since

the ammunition was recovered in California it was transported interstate.

 

36. UC-1 handed Chafin $3,500, but Chafin claimed the firearm was actually worth $3,700. UC-1 said that was not the agreed-upon price. Chafin then appeared to text someone; UC-1 suspected it was the individual in the Ford sedan. UC-1 gave Chafin an extra $180 in controlled buy funds that UC-1 had on hand for emergencies. Chafin said it would be okay.

37. Chafin handed the money to the driver of the Ford sedan and gave a thumbs-up, indicating it was okay.

38. The driver of the vehicle, later determined to be Khan, left the area in the white Ford. Investigators conducted mobile surveillance of Khan with the assistance of an aerial asset. Investigators followed Khan to East Market at 3405 El Camino Avenue in Sacramento. Khan went inside at approximately 4:12 p.m. and exited approximately at 4:38 p.m.

39. Investigators continued mobile surveillance on Khan, who eventually drove to a residence at 524 Eleanor Avenue in Sacramento, CA. Khan exited his vehicle and was seen entering the property, going into the backyard through a side gate at approximately 4:52 p.m.



Khan's white Ford Fusion was parked outside on 524 Eleanor Ave. Sacramento. Khan was observed entering the property through a side gate.

### *Identification of Khan*

40. Investigators obtained call detail records and a pen register for Chafin's phone number.

41. Analysis of that data indicated that on October 17, 2025, at approximately 3:14 p.m. (ten minutes prior to Chafin's call to UC-1 in connection with Undercover Purchase #2), Chafin made multiple cell phone calls to number 916-616-3954 (A-7) during the controlled buy operation. UC-1 observed Chafin's text message, which he identified as being from the "Pakistani," while Chafin and he conducted Undercover Purchase #2. UC-1 knew Chafin was talking to the "Pakistani" because Chafin said he was texting him.

   a. The number 916-616-3954 was associated with Khan and address 903 Carmel Avenue, Sacramento, CA (A-2) in Accurint.

b.  UC-1 was shown an image of Khan from a government database and UC-1 said it appeared to be the same person supplying the firearms.

***Undercover Purchase #3 (October 30, 2025; Sacramento, CA)***

42.  On October 29th, 2025, UC-1 contacted Chafin via phone number 530-315-5588.  Chafin had previously sent UC-1 a photo of what appeared to be a Russian-made PPS-43 submachine gun.  UC-1 asked about the price of the firearm.  Chafin initially said it would be $2,500.  Chafin agreed to sell UC-1, the Russian PPS-43, on October 30th, 2025.

43.  On October 30th, 2025, at approximately 11:11 a.m., Chafin told UC-1 that "he wants too much for that Russian thing way too much."  Based on previous conversations with Chafin, UC-1 understood that Chafin was referring to the "Pakistani," which was Khan.  Chafin stated that the Russian firearm now cost $4,000.  UC-1 told Chafin that he would buy a previously discussed AR-style rifle for $2,800, to which Chafin agreed.

44.  On October 30th, 2025, at approximately 12:50 p.m., UC-1 arrived in the west parking lot of Arden Mall at 1989 Arden Way, Sacramento, CA. At approximately 12:54 p.m., UC-1 informed Chafin that the transaction would take place on the west side of the parking lot.  Chafin told UC-1 that his vehicle was damaged, and he was waiting for a ride from Woodland, CA.

45.  At approximately 2:08p.m, Chafin arrived at the parking lot in the same white Chrysler 300 used in the initial purchase.  UC-1 observed Chafin exit the Chrysler from the front passenger seat.  Chafin then approached UC-1's front driver's side window and indicated to UC-1 that he was going to get the firearm.  Chafin walked out of UC-1's view, heading eastbound in the parking lot.

46.  Investigators observed Chafin walking toward a gray minivan with a California license plate 9VGC625.  Chafin grabbed a large item from the back of the van and then returned to UC-1's vehicle.



Chafin is retrieving a firearm from Khan's gray minivan.

    a. California license plate 9VGC625 is for a 2019 Honda registered to Zulmai Khan Hotak in Sacramento, CA.

47. Chafin got into the front passenger seat of UC-1's vehicle. The large item appeared to be a prayer rug, with a .223 American Tactical Omni Hybrid rifle bearing serial NS286771. Chafin handed the rifle to UC-1. UC-1 checked to make sure the rifle was empty and performed a function check, which the firearm passed.

48. UC-1 did not see a "full auto" function on the selector switch for the AR rifle, which is common on fully automatic rifles. Chafin stated the rifle was fully automatic (upon later inspection it was determined that the rifle did have a 3D printed auto sear). Chafin also handed UC-1, what appeared to be a 40-round capacity magazine loaded with ammunition. UC-1 asked for a lower price on the firearm, and Chafin agreed to $2,500. Chafin said he would make $300 on the original $2,800 price. UC-1 decided to pay $2,800 to build a relationship with Chafin.

    a. Based on the headstamp and my own research, I assess that the below cartridge provided in connection with the sale was likely manufactured by Precision Made Cartridges.



b.  Images from the 2025 Precision Made Cartridges catalog suggest that their products are made in South Korea (or "R.O. Korea"):





c. Further, according to https://bulkmunitions.com/blog/pmc-ammo/, "PMC ammunition is made by one of the main South Korean defense product manufacturing companies — the Poongsan Corporation."

d. In light of the above, there is probable cause to believe that this ammunition was transported internationally.

49. Chafin exited UC-1's vehicle and walked east through the parking lot, out of view. Surveillance units watched as Chafin returned to the gray van and spoke with the driver. Chafin then went back to his Chrysler and drove away from the scene.

a. One of the surveillance members observed the minivan driver and confirmed that Ahmad Khan was the driver and sole occupant.



Chafin speaking with Khan after the buy was completed before leaving the parking lot of Arden Mall. Chafin in white, Khan in gray.

50. Surveillance was established on both the gray minivan and Chafin's white Chrysler.

51. Surveillance followed Khan as he drove the gray minivan to 524 Eleanor Avenue in Sacramento, California. Khan parked in the driveway and entered the property through a side gate. He stayed on the property for about three minutes before leaving. This indicates the residence is a potential stash house for either firearms or currency as Khan returned there after two firearm transactions.

   a. One of the detectives involved in this investigation noted that: Khan visited this residence immediately after the buy operations conducted on October 17 and 30. On both occasions, Khan entered the property but only stayed briefly. During these short visits, the detective believes Khan was storing the currency he received from UC-1, possibly to hide it from law enforcement. This behavior aligns with tactics the detective has seen in similar criminal cases. Criminals often select locations like these because they believe such places are less likely to attract scrutiny from authorities and that their contraband or proceeds are less likely to be found or confiscated.

Furthermore, there are no signs that Khan has ever lived at this address or has any family ties to it.  This indicates that Khan's use of the residence is probably temporary and just for storage, not as a home.  In the detective's professional experience, such behavior and circumstances strongly indicate that the property is being used as a stash house, a common tactic among individuals involved in illegal activities to hide their contraband (such as firearms or currency) from law enforcement detection and seizure.



Khan's gray minivan is parked in the driveway of 524 Eleanor Ave. Sacramento.

b. I further note that during a subsequent buy operation on November 7, 2025 (further described below), a black Cadillac bearing license plate

9LEZ196 pulled into the driveway at 524 Eleanor Avenue.  In addition, when I conducted reconnaissance in the area on November 10, 2025, at approximately 5:02 p.m., a black Cadillac (which I suspect to be the same vehicle) was parked in the driveway (although I did not confirm the license plate):



c.  California license plate 9LEZ196 is for a 2009 Cadillac registered to Ilie Nicusor Grozav at 2741 Grove Ave, Sacramento, which is approximately 0.4 miles from 524 Eleanor Ave.  Grozav was charged with felony burglary (459 PC) and sent to juvenile hall on February 6, 2003 and it appears the case ended in a wardship disposition.  Based on law enforcement information contained in Accurint, I have reason to believe that in 2018 Grozav was present at the Grove Avenue address after law enforcement received a call reporting that several subjects were in a park directly behind the Grove Avenue address taking turns shooting a gun towards the park.  The caller described the subjects as three male white adults between the ages of 20-30.  Grozav, a white male 32 years of age at the time, answered the door but claimed he had just gotten home and was reluctant to allow officers inside to search for any weapons or contact those inside.  Law enforcement did locate numerous expended .22LR rim fire shell cases during a search of the park to the immediate west of the property (approximately 10-15 feet west of the N/W corner of the property).  A large tree approximately

25-30 feet west of the shell casings appeared to have fresh marks on its bark facing the direction of the shell casings.

52. After Khan stopped at 524 Eleanor Avenue, surveillance units then tracked Khan as he drove the minivan to 903 Carmel Ave in Sacramento, CA. Khan sat in the driver's seat outside for about five minutes before getting out of the van and walking into the house through the front door.

    a. I also note that Khan's mailing address with the California DMV is 903 Carmel Avenue, Sacramento.

53. Another surveillance member assumed a static surveillance position near 729 W Cross St. in Woodland, CA and watched Chafin arrive in the white Chrysler and enter the residence through the front door. The black BMW, which Chafin had driven to the undercover purchase on October 17th, was parked outside, and Chafin was seen working on the vehicle.

    a. I also note that Chafin's mailing address with the California DMV is 729 W Cross Street, Woodland.

***Undercover Purchase #4 (November 7, 2025; Sacramento, CA)***

54. On November 5th, 2025, UC-1 communicated with Chafin regarding the purchase of another firearm. Chafin sent UC-1 a picture of an AK-style rifle with a wooden stock and said, "fully for 3000." UC-1 understood this to mean fully-automatic when referring to firearms like rifles. UC-1 agreed to buy the rifle and told Chafin UC-1 would do it on Friday, November 7, 2025.

55. On November 6th, 2025, UC-1 texted Chafin to ask if everything was ready for the next day. Chafin replied, "He swear he said 35 so idk if u want it," and included a photo of an AK-style rifle with a folding stock, which was different from the rifle Chafin sent on November 5, 2025. UC-1 reminded Chafin that he initially told UC-1 $3,000. Chafin responded, "I know that's what he fuckin said but now he says he said 35 cuz after that he's gonna be gone he a truck driver." UC-1 believed Chafin was referring to Ahmad Khan based on previous conversations and controlled buys where Khan supplied the firearms. UC-1 asked Chafin if this rifle was "fully," and Chafin replied, "it is a fully."

56.   UC-1 told Chafin UC-1 would pay $3,000, not $3,500.  Chafin said he would talk to "him" to persuade him.  Chafin again mentioned that this subject, believed to be Khan, would be gone until next year after this transaction.  Chafin said, "He said he'll do 32," meaning $3,200.  UC-1 agreed to that price and scheduled the deal again for November 7, 2025, which was a Friday.

57.   On November 7th, 2025, at approximately 12:00 p.m., UC-1 made several attempts to contact Chafin but was unsuccessful.  During one phone call to Chafin's phone, a female answered and said she would inform Chafin that UC-1 had called. The female identified herself as Chafin's girlfriend.

58.   At approximately 1:43 p.m., Chafin called UC-1 and said his girlfriend had his phone because her son was going to juvenile hall.  Chafin then told UC-1 that when UC-1 was ready, he would call "dude" and they could meet up.  UC-1 told Chafin to meet him at the same spot as last time, which was the Arden Mall parking lot at 1689 Arden Way, Sacramento, California.

59.   At approximately 2:36 p.m., UC-1 arrived in the west parking lot of Arden Mall.  At the same time, Chafin texted UC-1, "10 min out."

60.   At approximately 3:11 p.m., Chafin texted UC-1, "I'm here."  Chafin said he had to "shake a sheriff" and had to "pull off" at a Shell gas station across from the mall.  UC-1 instructed Chafin to return to the Arden Mall parking lot.

61.   At approximately 3:21 p.m., Chafin arrived in the northwest corner of the Arden Mall parking lot, driving the black BMW sedan with California license plate 9AJS091.  This was the same BMW that Chafin used during the buy operation on October 17th.  Chafin parked directly next to UC-1's vehicle.  UC-1 watched as Chafin walked to the passenger side of his vehicle and removed a suitcase from the front passenger seat.  UC-1 recognized this suitcase from the October 17th controlled buy operation. It was the same suitcase Chafin had taken from Ahmad Khan's vehicle during the purchase.

62. Once inside the car, Chafin handed the suitcase to UC-1, who placed it in the backseat. UC-1 opened the suitcase; inside was a Nodak SA 2000M AK style rifle bearing serial number X001873 with a folding stock and no magazine inserted. Sitting next to the rifle was a California-compliant AK magazine with no ammunition inside.

63. Chafin told UC-1 that his girlfriend's son committed a robbery and was taken to juvenile hall, which is why Chafin didn't have his phone earlier. UC-1 checked the rifle, and it appeared to function. UC-1 suspected the rifle was semiautomatic, not fully automatic. Chafin stated the rifle was fully automatic.

64. Chafin further stated that the man, suspected to be Khan, was a truck driver who was planning to leave town soon. He also mentioned having another source for firearms through his girlfriend.

65. UC-1 asked whether the "Pakistani" could facilitate a large purchase the following week. UC-1 ordered two fully automatic rifles, two handguns, and another AR-style rifle. Chafin said he could do it. UC-1 gave Chafin an envelope with $3,200. Chafin counted out the money. When asked about the "Pakistani" getting the fully automatic weapons, Chafin said the person called the "Pakistani" just had to pick them up from his "uncles."

66. The two agreed to finalize the deal the following week. Chafin got out of the vehicle and UC-1 left the area.

67. Other investigators remained in the Arden Mall parking lot and observed the gray Honda minivan with California license plate 9VGC625. This was the same van Khan was seen driving during the previous undercover purchase on October 30th. A surveillance member positively identified Khan as the driver and sole occupant of the van.



Khan photographed driving the van around the parking lot of Arden Mall while Chafin was meeting with UC-1. He is the sole occupant of the van.

68.     Investigators observed Chafin get into the van's passenger seat and meet with Khan.



Chafin is entering the passenger seat of Khan's van after the transaction with UC-1 is completed. Khan is in the driver's seat.

69.    Shortly after, Chafin exited the van and returned to his black BMW, leaving the area.  Khan also departed in the van, and investigators followed him.

70.    Investigators observed Khan circling the block of Eleanor Ave., although he did not stop at any residences.  Investigators believed Khan was using a counter-surveillance technique.  A short time later, a surveillance member observed the gray van driven by Khan park in front of the residence at 903 Carmel Ave.  Khan exited the vehicle and entered the residence.

### CELLULAR PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

71.    As described in Attachment B, this application seeks permission to search for items in data from cellular telephones.  The warrant applied for would authorize the seizure of cellular phones, electronic storage media, electronically stored information from that storage media, and potentially, the copying of electronically stored information from that storage media, all under Rule 41(e)(2)(B).

72.    *Forensic Evidence.*  As further described in Attachment B, this application seeks permission to locate not only files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how the phone was used, the purpose of its use, who used it, when it was used, and/or where it was used.

73.    Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion.  Information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection

programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information that can indicate when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

74. The process of identifying the exact files, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

75.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

76.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying the phones and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of the internal memory to human inspection in order to determine whether it is evidence described by the warrant.  The authorization of this examination extends to any agency or party working at the direction or request of the FBI, regardless of the jurisdiction or physical location of the agency or party.

## REQUEST FOR SEALING

77.    This is an ongoing investigation involving firearms trafficking by convicted felons who have demonstrated access to rifles and ammunition, a willingness to deal in same and a willingness to deal in significant amounts of cash.  Disclosing the Applications for Search and Arrest Warrants, the Search and Arrest Warrants, and this Affidavit to the public has the potential to alert the subjects to the details of the investigation, motivate them to flee and attempt to influence potential witnesses and motivate those knowledgeable of illegal activity to destroy evidence.  Further, disclosing the details of this investigation in advance of warrant execution has the potential to motivate the subjects to prepare for armed confrontation with law enforcement.  Accordingly, I request that the Court issue an order pursuant to which the Applications for Search and Arrest Warrants, the Search and Arrest Warrants and this Affidavit be filed under seal until further order of this Court.

## CONCLUSION

78.    Based on the foregoing facts, I hereby request that search warrants be issued for the locations identified in Attachments A-1 through A-13 for the

items described in Attachment B.  I further request that arrest warrants be issued for Terry Chafin and Ahmad Waley Khan.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

/s/ Matthew J. Weissenborn
MATTHEW J. WEISSENBORN
FBI Special Agent

Sworn and Subscribed to me telephonically, on November 14, 2025,

Hon. JEREMY D. PETERSON
United States Magistrate Judge

Approved as to form:

JUSTIN LEE
Assistant United States Attorney

## <u>PENALTY SLIP</u>

### <u>United States v. Terry Chafin and Ahmad Waley Khan</u>

**<u>COUNT ONE</u>:**  18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm

Fine of up to $250,000, and/or
Imprisonment of up to 15 years, or both
Term of Supervised Release of up to 3 years
Mandatory $100 Special Assessment

**<u>COUNT TWO</u>:**  18 U.S.C. § 922(a)(1)(A) – Unlawful Dealing in Firearms

Fine of up to $250,000, and/or
Imprisonment of up to 5 years, or both
Term of Supervised Release of up to 3 years
Mandatory $100 Special Assessment